Gregory Owens is here for the appellant Weiher, David Calto is here for the appellee Lincare. Mr. Owens, you may begin. Good morning, and may it please the Court, Greg Owens on behalf of the appellant Don Weiher. Your Honors, this is an appeal of an order from the District Court granting summary judgment in favor of the defendant Lincare Procurement. In Judge Covington's summary judgment order, her primary focus was on pretext. And while Judge Covington found that there were some evidence of pretext, particularly with suspicious timing and temporal proximity, ultimately she decided that the plaintiff was unable to rebut head-on the legitimate non-discriminatory reasons advanced by Lincare and therefore was unable to establish pretext and therefore granted. I don't know how you establish pretext when you're late to work 117 times from January to July of 2019. In 95 occasions, you were over 30 minutes late, and from September the 9th through the 13th, you're late every day of the week. And then you've got the incident that took place on August the 14th of 2019 during the IT executives meeting where she started screaming at the executives and aggressively shoved papers in their direction across the table. Thank you for the question, Judge Wilson. The tardiness that you're referring to occurred and was by reason of her disability and was a reason why, primary reason why, she requested a reasonable accommodation to be able to start 30 minutes after her designed start time by the employer. In terms of the meeting that you're referencing, her supervisor in an email to his supervisor specifically said that he did not intend to warn her for her actions and in fact, commented that her work performance was solid at that point. And so, in terms of rebutting it head on, I believe that Judge Covington overlooked and glossed over certain pieces of relevant evidence that I think a jury could, a reasonable jury could find. First, in February of 2019, she received a positive performance evaluation. There was an email from the COO of the company and her supervisor a couple of months later indicating that she saved the company $2 million. In that email that we just talked about, Judge Wilson, it was noted that both the quality and quantity of her job performance was good in August of 2019. And then she asked for the accommodation and that's when things began to unravel. And so, the question ultimately, I think for a jury would become, is that a coincidence or was it some sort of unlawful motive? She got the accommodation, right? She got the start at 9.30 and everybody else had to start at 9 o'clock. Correct. She got the accommodation. You're absolutely right. And immediately thereafter, her boss started a campaign to try to terminate her. He wanted to skip over their progressive disciplinary steps. He wanted to go directly to termination and just jumping back in terms of rebutting head on their reasons. Another important thing to remember, and this is by her supervisor's own admissions, she was extremely overworked, had more work than a single person could do. And then later after asking for the accommodations, she then becomes criticized for not being able to complete some of those duties and responsibilities. What I think is also important is, and what is unique about this case, this was a situation where the plaintiff herself, after being issued a final written warning, did rebut head on through an email with backup emails and other evidence showing that what was in the final written warning was inaccurate. That dispute was then escalated to Human Resources, and the gentleman from Human Resources was required by their own policies to engage in an investigation and I believe within 10 days provide a response. He did not. He did neither. In fact, he claimed that he interviewed several people. Those same folks, in fact, are my clients and supervisors, denied that he ever spoke to him. The record is devoid of any writing or finding. And so a reasonable jury can infer a few things from that. One is that it was a foregone conclusion that she was going to be fired, that there was no reason for any sort of investigation at that point. Or two, that what Ms. Weir put in her rebuttal was accurate, and there was no reason, and it was essentially a tacit acknowledgment by HR that what she either put was accurate or what her supervisor put in the final written warning was inaccurate. I mean, I'll give you my sense of reading the record, and I haven't, of course, read every deposition or affidavit or document. It seems to me that she was under a ton of workload pressure. Absolutely. But that doesn't mean that she was discriminated against or retaliated against on the basis of disability. It looks like to me that, at least at first glance, that her immediate supervisor didn't really care about the fact that she was overloaded and wanted results. And when those results were not coming as quickly as he wanted, he took some stuff away from her, did some stuff on his own, et cetera, et cetera. But how do you, the district court, I don't want to put words in the district court's face, a performance issue for one reason or another rather than a discrimination issue. What did the district court get wrong? I know you've given us some pieces of evidence that you think shifted the meter one way or another. Sure. Well, first, in terms of, you know, rebutting it head on and then also showing evidence of discrimination that a reasonable jury could utilize in determining that pretext was established. First, in the midst of the discussions about an ADA accommodation, there was a comment from Ms. Weir's supervisor to her saying this could lead to a lawsuit. And so it's with that backdrop that that's what the defendant was looking at in that case. You fast forward then to his own acknowledgement that, yes, we're making this accommodation for her and it's going to be kind of difficult to manage because other people are showing up late as well, which Judge Wilson addresses in one of the questions you had earlier. Then you fast forward to an eyewitness who literally sat right next to Ms. Weir who testified that after she made the request for accommodation that Mr. Fanning, her supervisor and the decision maker, that his behavior changed dramatically toward her. Then you get to the situation where Mr. Fanning is on this campaign to terminate her. And skip over progressive disciplinary steps. Ultimately, HR has to step in and they say, wait a minute, this doesn't look good. We need to make sure we're aligned. And so ultimately where that alignment occurred was to say, you've got to go through the steps first if you want to get rid of this woman. And he said, okay, fine. So he does. And then he fast forwards again, we need to terminate her. And so that alignment, when HR was asked about that in a deposition, they said, look, we're it would raise a red flag to terminate this woman within days, or in I think this case it was 39 days after she had requested the accommodation and had it granted to her. So this is a situation where there's more than just, as the district court said, quibbling with their reasons. She's met head on and disputed the reasons, which was all performance based. There were some nuances within it, but it was all performance based. Where she not only rebutted them head on in the litigation itself, but in fact rebutted them head on in her own email disputing the final written warning. And then there's also evidence of discriminatory motive by the supervisor or retaliatory motive, because certainly you can establish these things through temporal proximity. And I appreciate and agree with the court that temporal proximity alone cannot establish pretext, but it can be a way that you can establish pretext, one of several. On that point, there was a gap of about 10 months between the time that she received her disability accommodation and the time that she was terminated. What do you do with that 10 month period in terms of proximity? And I'll concede, compared to your normal temporal proximity cases, it is pretty distant. But I think there's two differences in this case. First is the fact that it appears that a reasonable jury could infer that Fanning had already made his decision within that month after she had gotten the accommodation. And so then HR says to him, hold on, we got to be in alignment. This is going to raise a red flag if we do something now. So they wait. Then you fast forward into April of the following year. They feel like they don't have to wait anymore. He now starts talking to him again about termination, but doesn't pull the trigger until she starts asking again for time off for her doctor's appointments. And then he says, I want to expedite it right now. The other thing in terms of the temporal proximity, that oftentimes goes to causation more than it does pretext. It can be an element of pretext. But causation can't only be proven by temporal proximity. It's a way to do it. But at the same time, and as this court has said, it's just showing that the decision maker had knowledge of the protected activity and that the protected activity and the adverse employment actions are not unrelated. In other words, is it a but-for causation? And I think a reasonable jury in this situation could look at it and say, but-for Ms. Weir asking for and getting approved for reasonable accommodations for her disability, that she would not have been written up and not been fired. And my time is up, unless you have any questions for me, Your Honors. All right. Thank you, Mr. Owens. Mr. Kalto. May it please the Court, good afternoon, Your Honors. This case, it really is all about temporal proximity. Ms. Weir has tried to make it a lot more than that. They've thrown a lot of these different pretext arguments against the wall. But if you actually look at each one of them and look at the record, look at the case law, they just really don't stick. And for example, Mr. Fanning, the supervisor, he was the one who actually told Ms. Weir to go to Human Resources. That record is undisputed on two different occasions. He told her to get the accommodation. So why would he have an animus towards her because she went ahead and went to HR and got that accommodation? Because she wasn't putting out work. Right. Given that, I'm giving you a possible other way of looking at it, that she wasn't performing at the level necessary with the accommodation. Right. But there's no, there's no comments in the record. There's no, there's no. Why did he, why he first expressed to HR that he wanted to terminate her a little more than a month or so after she got the disability accommodation, right? Right. What were the reasons he provided at that time for wanting to let her go? So it was a combination of performance reasons and there was lack of responsiveness, which there's emails showing that there was a responsiveness issue prior to the accommodation being approved. There was failing to complete job duties. There was disrespectful conduct from the IT meeting, the August 13th IT meeting that you mentioned. So there were a number of different reasons why he wanted to terminate her on November 5th and tardiness attendance was not one of them. And she was working the same amount of work hours with this adjustment, right? It wasn't like she got to work 9.30 to 5. She worked 9.30 to 5.30. So that really shouldn't be a reason for a lack of production. If there's a lack of production there, it's of course going to be an issue, but nothing to do with the actual accommodation itself. She says there isn't in the record any documentation to reflect her poor performance. No emails, no documents, no memos, none of that. That's just simply not true. There's a lot of emails and I can identify those if you'd like. They're in the record? Right. They're in the record. They're showing her lack of responsiveness. There's at least, I believe, three emails where there's chains from the field. So she was in procurement, so she would constantly contact the field. And there'd be weeks on end where they're trying to get responses from her and she's just not responding or responding late, holding up projects. There's of course emails from Mr. Fanning to Human Resources about Mrs. Ware, his concerns with her conduct, her performance. She says in her brief that in August of 2019, Fanning informed the Chief Operating Officer at LendCare that she generated $2 million in savings, possessed great skills, and was getting help for being overwhelmed and there was no mention of poor performance. Why couldn't she make that argument to the jury? That's evidence that ought to be taken into consideration in determining whether or not she was discriminated against on the basis of her disability. Sure. Good question. So in that email, there was positive and negative feedback. The feedback in the email may have been more concerns about her conduct or attitude in general, but there were concerns for Mr. Ware prior to the accommodation. It wasn't like he had no emails in the record before that accommodation occurred. And there were a lot of performance issues in the record that occurred after that August 19th email to Mr. McCarthy. So that would of course show that there were performance issues that occurred after that email and those were some of the issues that were in that November email to HR where he wanted to terminate their employment. And also eventually in the email to Human Resources later on in April when he made the decision to terminate and eventually in the termination letter in July when they actually sent that letter out to Ms. Laird terminating her employment. Right, so just going back into it, as we've discussed, temporal proximity in and of itself is insufficient to establish pretext. You have to meet the termination reasons head-on. In Lynncare, they proffered four or five different termination reasons. I don't think it's appropriate to categorize them all as performance. For example, there's a lack of responsiveness. This was a common theme in every single email Mr. Fanning wrote from September all the way to that last April email to HR requesting the termination and all the way to the termination letter. Lack of responsiveness. There's record evidence where Ms. Ware admits to being on these emails. She admits that things were slipping through the cracks. To establish pretext, like we've discussed, you have to meet it head-on. You have to rebut it. You can't just argue a temporal proximity or maybe it happens you have to actually specifically look at the reason and say why could this not have occurred. One of the points that Mr. Owens made was that there is a real discrepancy in the record about whether or not the company investigated her complaint. The person from Human Resources said that he or she had investigated, had interviewed certain people, but those interviewees said that they were never contacted, never spoken to and that there was no investigation on her complaint and that adds to the sort of mosaic that gets her to a jury. How do you respond to that? I would say that that is a policy slight deviation made by an employee that was not involved whatsoever in the termination decision. Shiraz Mohammed was not the decision maker. That was Mr. Fanning. Shiraz Mohammed works in HR, but he was not the HR rep that prepared the termination letter. There was no nexus there and that's what's required when you're trying to show that a policy deviation was a pretext. You have to show a nexus between that and the protected conduct or the discrimination or excuse me, the protected class or the adverse employment action and because Mr. Mohammed was removed from all of this, that's why that would not be one of the tiles in that convincing mosaic framework. It is odd though that if you look at the evidence in the light most favorable to her, that this is what it's supposed to be and that then when Mr. Fanning first says that he wants to fire her, HR puts the brakes on and says, hey, hey, it's going to look bad. We better not fire her now, she just got an accommodation. Those two things don't speak, they don't look good. And I would say that HR's involvement in a major decision, whether it's even a written warning or a termination, HR's involvement, that's very par for the course. I don't think that would show pretext and the red flag characterization is not an accurate depiction of what the record states. What the record states is that HR got involved and eventually they made the decision with Mr. Fanning to let her, hey, let's give her another chance, let's let her come on and see if she improves her performance and Ms. Weyer actually did improve for a couple months and then unfortunately it fell back down around that March time frame. Can I ask you a question about the retaliation claim? Sure. So one, so you know, everybody's kind of treating these two claims as the same thing and I just find that sort of concerning. So usually in these cases you see, you know, I'm in a protected class, that's one claim, then I made a complaint, you know, I raised that status and that's another claim. Here it seems like the argument is, I guess my question is, is there really a separate retaliation claim? Is there a proper retaliation claim here at all? Right, that's a great observation. Really the claims have all been conflated into this one, in my mind it's more of a retaliation claim if anything. Ms. Weyer is alleging that because she made this request, that's the reason her employment was terminated, right? It all went downhill after that. So I think you could argue either way that there's not, there might not be a true disability claim or there's definitely not a separate retaliation claim based on a dispute. At least there's nothing in plaintiff's opposition to that effect. Right, I guess and the reason why I'm just trying to figure this out is because it's I mean, if the argument is that they retaliated against her for requesting and receiving an accommodation, then that event took place a long time prior. If the argument is that they retaliated against her for the specific ask of some time off for the doctor, then that's a different issue. How do you understand the retaliation claim with respect to the timing? Right, so the retaliation claim that is alleged in the complaint is the first example you mentioned, right? It only has to do with the accommodation itself. Throughout the briefings, they've brought up these doctor appointments and most of these requests to go to the doctor don't mention anything about a disability. They don't mention any of the specifics that were in the ADA paperwork. It could be something like, I have to leave early for a cold. I mean, these are just common requests that go that she's going to see a doctor. They don't necessarily relate to her disability. Those would be covered, I mean, and just correct me if I'm wrong, but the way I understand this area of the law is those would be covered by the Family Medical Leave Act would tell you whether you got time off to do something like that. And you could bring a retaliation claim under the Family Medical Leave Act if you thought, you know, someone was saying, well, you asked for a doctor's appointment. We're going to say you can't have that and we're going to fire you. That would be a separate claim under the Family Medical Leave Act, right? Right. If it's a specific request for leave, arguably you might be able to ask for that under the ADA as well. But anyways, there's definitely no failure to accommodate claim here and that really should be a claim that was separately alleged or at least one of the numbers in the complaints should have at least said, hey, I was also terminated because I requested doctor's appointments. But I think it's a good point on that temporal proximity note. So one thing that we have not mentioned yet, back in July, Mr. Fanning actually, after seeing that she was tardy for 117 times, that was from January 2019 to July 2019. So in July 2019, Mr. Fanning actually went out and offered her an exception from 9 to 930. And so at that point, he knew she had some kind of health issues or health conditions. He didn't know what it was. So really, the temporal proximity from a disability standpoint would, I guess, start there. I think it's much less probative in the disability discrimination analysis anyway. Because how do we weigh the factor that the employer gave the requested accommodation in the disability and retaliation? I mean, usually, once again, this is just sort of an odd case. I mean, usually when you're bringing a claim saying you fired me because of my disability, the employer has denied the accommodation and not given the accommodation. Right. And so that's exactly the opposite of pretext, right? If you're looking at all the undisputed facts in the record, you're going to see that Lincare approved the accommodation. That was in effect throughout her employment. You're going to see that Mr. Fanning informed her, hey, on two different occasions, this is undisputed, that I want you to go to Human Resources if you need a later start time. They're going to see that Mr. Fanning offered her this exception, informal exception back in July. They're going to see that Mr. Fanning approved every single doctor's appointment she asked for. They're going to see that there really is no evidence of pretext here, and that's why this temporal proximity comes into play. It's really the only thing left when you look at all the arguments closely. I have one more. One more. This is a record question. So Judge Jordan asked you about, you know, what evidence is there in the record of her lack of responsiveness, things like that. One of the footnotes in your brief, footnote 21 of your brief, stood out to me, because in that footnote you say when she was terminated, she had over 400 unread emails from colleagues in her inbox, and that that was evidence of lack of responsiveness. Where does that number come from, and is that undisputed? Do we have any idea what those emails were about? Could you just unpack that a little bit for me? Sure. So that was a screenshot of her inbox when her employment was terminated. Okay. So all we know is that she had over 400 emails that were not read. We don't know, you know, they could have been from gap.com or something like that as well. I mean, do we know that those were work emails? Right. We have not done that in-depth investigation into that, but there is a lot of other evidence in the record as far as her lack of responsiveness. There's actually emails where she specifically says, hey, I'm struggling to complete these job duties. And I know we got into that discussion a little bit with Mr. Owen's argument, but Mrs. Weyer's opinion of, you know, this isn't fair, I'm overworked, that is not what we look at as a pretext. The pretext is the employer's belief, the fact that she might have believed that her termination reasons, any of them were unfair, that there's a reason behind it, a justification behind it. That's not relevant for the pretext analysis. And this court has time and time again held, and I think Judge Brasher, you recently held in a case, I believe it was called Owens versus Governors off of Student Achievement, that even just one termination reason, if Mrs. Weyer cannot prove one, let's say the other three have questions, if there's just one she can't prove, that's enough to grant summary judgment because she failed to establish pretext. And if you look at all the termination reasons, none of the proffered pretext evidence, none of it actually refutes it, meets it head on and meets that burden. And I also think there's causation issues as well, but Lynn Kerr asks you to affirm the district court's grant of summary judgment in its favor. Thank you. All right, thank you. Mr. Kelto, Mr. Owens, you reserve some time for rebuttal. Yes, thank you, Your Honor. Judge Brasher, you brought up the conflation between the two claims, and I think that's an important distinction here. I believe they got conflated because the focus at the district court level was on pretext, but the two separate and distinct claims, one is a discrimination claim under the ADA where Ms. Weir simply has to establish that she had a disability, she was qualified and she was discriminated against. Burden then shifts to the defendant to articulate legitimate non-discriminatory reason or reasons, and then it's our burden ultimately to establish pretext. And we've talked about pretext quite a bit today, and Judge Jordan brought up the convincing mosaic model, which I would submit to you under either the traditional McDonnell-Douglas or convincing mosaic, that there is certainly enough evidence and weighted evidence of pretext that a reasonable jury could rule in Ms. Weir's favor. For the retaliation component, again, the prima facie case is simple. She engaged in protected activity by requesting the accommodation. Okay, so then you agree then the request for the accommodation is the protected activity under retaliation? Yes, Your Honor. What do we do with it? I mean, and maybe I'm just overthinking this, but what do we do with the fact that she got the accommodations you requested for? I mean, that seems like an odd thing to say, you retaliated against me because I requested an accommodation that you then gave me willingly. Yeah, I appreciate that, and I think the distinction here is that it was a defined medical accommodation process through human resources. Human resources who were folks who were not operational, were not making decisions regarding her employment. So that's who made the decision, and with regard, there was a point brought up about Mr. Fanning, and I think this is important. I think the concept was, well, how could he harbor a discriminatory animus toward her if he was okay with the accommodation? And there's some nuance to that because initially, Mr. Fanning verbally gave her the okay to commit at 930 as an accommodation. When his supervisor, Mr. Ratner, found out about that, said that was unacceptable. Then the COO of the company becomes involved and starts asking questions about what does she need, what's her real issues, those kind of things. And so I think there certainly is an inference that perhaps Mr. Fanning himself did not harbor the animus, at least at that time. Maybe he did later after the complaints, but that he was getting pressure from his supervisors who had a problem with the fact that she was getting the accommodation. And look no further than Mr. Fanning's supervisor who sent an email during that time saying that our core hours are from 9 until 4, 430. I'm not sure which one it was, but, and that has to be without exception, and then that was forwarded to Ms. Weir as she was in the midst of her informal accommodation. And this may not matter at the end of the day, but the thing I'm, once again, kind of having trouble with is the sort of the hypothetical that you put forward, which is she requests the accommodation, she gets the accommodation, and then her supervisors don't like the accommodation and kind of don't like her because, you know, she's coming in late and even though she has a reason to, they don't like it and they want to fire her for that reason. That seems like a straight up disability, that seems like just a straight up, you know, you're retaliating against me for asking for something or reporting something. I just, is that really a separate claim, I guess, or is it just the same thing as, you know, you're discriminating against me because I'm disabled and I can't come in at 9 o'clock? Yeah, and I get what you're saying and I think that in a lot of ways that is true and I think really the big difference is simply that discrimination and retaliation cases are analyzed slightly differently under McDonnell-Douglas. But from a pretext standpoint, I agree. I think all of that is kind of in the same bucket. I mean, all the behavior of the time. The adverse action is, as I read the briefs, is the same for both, right? The termination. Yes and no. In some retaliation discrimination cases, they're not necessarily the same. Correct. Right? You could have docked a person's pay, you could have moved them to a less desirable position, you could have suspended them without pay, and then ultimately the termination comes. But here, the adverse action is the same for both. It's determination. Determination for both and then under the retaliation component, we've argued that the final written warning is also an adverse employment action because it ties termination to it. So, as your honors are well aware, I mean, there's cases where an employee gets a warning but it doesn't have any sort of ultimate employment decision potentially tied to it and the court has said that that's not an adverse employment action for retaliation purposes. Keep in mind, an adverse employment action under retaliation is different than under discrimination. But in this case, the final written warning specifically said up to and including termination and then when she was ultimately terminated, the termination form said it's because you didn't improve under the final written warning. All right. Thank you, Mr. Owens. Thank you, your honors. Mr. Kelto.